## AUTOMOTIVE MAINTENANCE MACH. CO. v. PRECISION INSTRUMENT MFG. CO. et al.

### No. 8392.

Circuit Court of Appeals, Seventh Circuit.

June 26, 1944.

Frank Parker Davis, Harry W. Lindsey, Jr., Raymond E. Fidler, George N. Hibben, and Albert J. Smith, all of Chicago, Ill., for appellant.

Will Freeman, W. P. Bair, and Dayton Ogden, all of Chicago, Ill. (George H. Jirgal and Robert L. Grover, both of Chicago, Ill., of counsel), for defendant-appellee, Snap-On Tools Corporation.

Casper Wm. Ooms, of Chicago, Ill., for defendants-appellees, Precision Company and Kenneth L. Larson.

Before SPARKS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

SPARKS, Circuit Judge.

On June 15, 1942, plaintiff charged Precision Manufacturing Company, Kenneth Larson, and Walter Carlsen with infringement of United States patents to Larson, No. 2,279,792, and to Zimmerman, No. 2,283,888. By amended petition filed November 30, 1942, it further charged infringement of reissue patent No. 22,219 of which patent No. 2,269,503 was the original. These patents were issued, respectively, on April 14, May 19, and November 3, 1942, on applications filed respectively on October 1, 1938, November 22, 1937, and May 31, 1938. All of them relate to torque wrenches, and the applications were assigned to plaintiff.

The joint amended answer of the defendants, filed February 8, 1943, alleged that the defendant Larson had committed perjury by filing a false affidavit with the Commissioner in support of his patent, in an interference proceeding between that patent and the Zimmerman patent No. 2,283,888; that plaintiff knew of that perjury prior to December 23, 1940, and failed to divulge it to the proper authorities; that by reason of that knowledge it threatened the defendants with criminal prosecution unless the defendants would sign the contracts hereinafter referred to, and it promised defendants that it would suppress such evidence of perjury as it had, if defendants would sign the contracts; that under and by reason of those circumstances they signed the contracts against their will; that those contracts were unreasonable and unconscionable and their execution by defendants was procured by the inequitable conduct of plaintiff by which its hands were soiled to such an extent that its bill of complaint should be dismissed.

July 6, 1942, Snap-On Tools Corporation filed a petition for a declaratory decree relating to the controversy with respect to the Larson patent and the contract of December 20, 1940, which plaintiff and the defendants, Larson and Precision, had signed. In final form, by amended petition filed March 1, 1943, the facts therein alleged are substantially the same as set forth in the answers in the other suit. Automotive by way of answer and counterclaim set forth substantially the same allegations, and demanded practically the same relief as demanded in its original action.

By agreement, the two cases were consolidated for hearing on the sole question of inequitable conduct, and voluminous evidence was heard. At the close of the arguments, the District Court rendered an oral opinion on May 21, 1943, which is not in this record, and on July 12, 1943, it filed its special findings of facts, and rendered its conclusions of law thereon. At the same time it filed the following:

"Memorandum.

"In this case, the court rendered an oral opinion at the closing of the arguments. At the request of M. K. Hobbs, an attorney who testified in the case, the court has re-examined the record.

"It is not the intention of the court that the statements in the opinion should be construed as implying that Mr. Hobbs had willfully given false testimony or had been guilty of professional misconduct. Accordingly, the oral opinion is withdrawn and is not to be filed as a part of the record. The Court has entered written findings and conclusions. It appears from an examination of the record that the witness Hobbs did not testify falsely; that he has adhered to the rules which govern the relations existing between attorney and client and that he was not guilty of any professional misconduct or criminal act."

Upon the conclusions of law, and consistent therewith, the court rendered judgment dismissing the complaint, the amended and supplemental complaint of the first action, and the petition, amended petitions and the counterclaims of the second action, all for want of equity. It further ordered that there should be no award for costs. From that judgment Automotive has appealed. Plaintiff and the corporate defendants, including Snap-On, which is considered as a defendant herein, will be hereafter referred to respectively by the first word of their corporate names.

Prior to 1938, Automotive was engaged in the production of a torque wrench invented by Zimmerman, one of its employees, and Snap-On was one of its customers for that wrench.

In 1938, George Thomasma, one of Automotive's trusted employees, who was fully acquainted with its wrench business and with the Zimmerman developments, secretly gave information to the defendant Larson, and they, with one Carlsen, cooperated to establish a competing business with Automotive. Snap-On was approached by Larson with respect to its taking on the wrench which had been developed by him

and Thomasma from the Automotive wrench.

On October 1, 1938, Larson filed his application for his patent above referred to, by Alberts, who was then attorney for both Larson and Snap-On. The application was assigned to Snap-On under the terms of an agreement between them dated September 28, 1938.

At that time the application did not claim anything that was common to the Zimmerman and Larson wrenches, but the claims, as interpreted by the disclosure, were limited to a detail which comprised a tail-piece for operating a gauge mechanism. This, we think the evidence clearly discloses, was Larson's contribution, and it was so asserted at the trial by Alberts.

On October 18, 1938, Alberts, Snap-On's patent attorney, had Larson execute for Snap-On an affidavit to the effect that no employee or ex-employee of any competitor of Snap-On had anything to do with the development of his wrench, or would be associated with Larson in the enterprise; that he alone had invented it; and that no other individual had contributed any concept or feature of it.

On October 26, 1938, Snap-On supplied Larson with a letter promising to place with him an order for a quantity of those wrenches. Larson thereupon solicited financial support for the enterprise which was calculated to take away from Automotive its wrench account with Snap-On, and in December 1938, Precision was incorporated. Larson and Thomasma were given stock for the work they had done on the wrench, and Carlsen was given stock for his services, and he also paid cash for some. Larson became president of that corporation, Thomasma was made vice-president, and Carlsen was made secretary and treasurer. The three comprised the board of directors, and Automotive's entire business from Snap-On was taken away by Precision.

Wacker, president of Automotive, had heard rumors that Thomasma, then in its employ, was one of the incorporators of Precision, and, without authority, had removed from the Automotive plant some tools and wrenches. In June 1939, he confronted Thomasma with those rumors. Thomasma denied his connection with Precision, but admitted he had removed some wrenches. Thereupon Wacker discharged him.

On August 31, 1939, the Patent Office suggested to Larson certain claims appearing in the Zimmerman application. Thereupon, Larson through Alberts copied the broad Zimmerman claims in his application, and the Patent Office declared an interference on October 11, 1939, on the counts comprising those claims copied from Zimmerman.

At the request of the Patent Office, Larson, under oath on August 5, 1940, gave the dates of his conception, disclosure, drawing, description and reduction to practice. Those dates were false and antedated Zimmerman's from one to three years.

Within a day or two after receiving a copy of Larson's preliminary statement as to his dates, Automotive authorized its attorney to conduct an examination of the facts alleged therein. For that purpose he employed an investigator who had performed similar work for him in years past.

Larson was required to produce his evidence first. Nine witnesses, including himself, were examined, and considerable documentary evidence and physical exhibits were received in evidence on his behalf, the hearing of which began October 24 and ended November 4, 1940. It substantiated Larson's early dates, and cross-examination failed to discredit it.

On November 3, 1940, the day before Larson closed his proofs, Thomasma and his attorney attempted to sell Thomasma's Precision stock to Wacker, president of Automotive. He then asserted that he had given Larson the idea of developing a wrench from the Automotive wrench, but he disclosed no specific facts with respect thereto. Wacker refused the offer.

On the evening of November 7, 1940, Thomasma voluntarily went to the home of Fidler, the attorney for Automotive, and also returned there the following evening. During those times he voluntarily made a statement with respect to his and Larson's work on the wrench. It was taken down in shorthand, transcribed, and sworn to by him on November 15, 1940, and is quite voluminous. He stated therein that Larson came to his home in November 1937, where they discussed the possibility of making a tension wrench, and at that time he showed Larson a socket, a piece of drill rod and a handle; that Larson then made some patterns, and that several wrenches were made by Larson before any drawings of the wrench were made. He

further stated that he made a drawing of the device in June 1938, and that it was the same drawing offered by Larson in the interference as the work of a high school boy on May 20, 1936. Automotive, after protracted efforts and considerable expense, was unable to secure anyone who would verify Thomasma's statements, but it learned from its investigation that Larson and Thomasma were then unfriendly and that Larson and Carlsen were trying to force Thomasma out of Precision.

On November 18, 1940, Automotive's attorney, Fidler, submitted to an outside attorney of good standing and large experience the question as to whether he should submit the matter to either the Patent Office or the District Attorney. He was then and there advised not to submit it at that time to either, as the Patent Office would not consider it until plaintiff's proofs were in, and the District Attorney would not touch it so long as the priority proceeding was pending. He further advised in effect that on account of plaintiff's paucity of proof, and the former disloyalty of its only witness, it could not hope to discredit the nine witnesses whose testimony had supported Larson's priority, and that a suit for damages by the defendants might ensue. He suggested that the better way would be to take the matter up with the attorney for Larson and Snap-On.

On November 20, 1940, Fidler informed Alberts of the contents of the Thomasma affidavit, and Alberts arranged for a meeting on November 28, 1940, which was attended by himself, Fidler, Thomasma, Snap-On's president, and Automotive's president and vice-president. There Thomasma related his story in substantial accord with his affidavit, whereupon Alberts said he would withdraw as attorney for Larson if the facts, as stated by Thomasma, were true. However, he remained Larson's attorney of record in the Patent Office until December 24, 1940, when Larson's application was assigned to plaintiff, as hereinafter referred to.

On the same day, Alberts and Johnson called Larson and Carlsen in consultation, and told them the substance of Thomasma's statement. Alberts said to Larson that if the statement were true, he should get another lawyer, and he recommended any one of three attorneys, including Mr. Hobbs. At that meeting Larson reluctantly confessed that part of his testimony was false.

Thereupon he and Carlsen left the room. The substance of this conversation was not disclosed to plaintiff nor to its attorney. The next day, on November 29, Larson and Carlsen employed Hobbs to settle the interference with plaintiff, and for no other purpose. They then notified him that they were willing to concede priority to plaintiff.

Earlier on the same day, Alberts had communicated with Hobbs, and told him that there was an interference between Zimmerman and Larson. He also said that Thomasma in his affidavit had attacked the originality and date of Larson's drawings, and that he was afraid they were not true, and he thought the interference suit should be settled. Hobbs has never seen Thomasma's affidavit, nor any of the interference evidence, and no one at that time had ever told him that Larson and Carlsen had perjured themselves. Larson, Carlsen and Alberts testified that they told Hobbs of the perjury on that day, but Hobbs denied this, and the District Court tells us by this record that Hobbs told the truth. However, the substance of these conversations was never disclosed to plaintiff or its attorneys.

On the same day, Hobbs notified Fidler that he was employed to settle the interference, and suggested a conference. December 2 was agreed upon, and on that date, before plaintiff or its attorney had proposed any terms, Hobbs proposed that Larson concede priority, that plaintiff give a release for civil damages, and that it license Precision to fulfill existing contracts and commitments for wrenches. This proposal was confirmed by Hobbs' letter to Fidler of December 6, with the suggestion that no royalty be paid on orders received prior to the settlement, but that there be a continuing royalty of three per cent upon the sales price of orders received thereafter. This proposal was conditioned upon "securing back from Thomasma" his stock in Precision, concerning which the letter stated, "You may be able to be of help to us in this connection." On the same day, before receiving Hobbs' letter, Fidler notified Hobbs that the proposal was satisfactory to plaintiff, but suggested that the royalty proposal should come from Precision and Snap-On. After receiving Hobbs' letter Fidler notified Hobbs that Automotive wanted a ten per cent royalty.

Further consultations and correspondence were had by counsel for the various

parties without agreement, and on December 17, Alberts, on behalf of Snap-On, notified Fidler that Larson could not settle with Automotive without Snap-On's cooperation, and that no further concessions could be made by the latter regardless of the outcome of the controversy. Thereupon, on the following day, Zimmerman served notice of taking depositions, coupled with a demand that Larson furnish his attorneys with a complete transcript of Larson's interference testimony, which had not been fully transcribed by the reporter who was employed by Alberts. Alberts then, by letter to Hobbs, attempted to substitute Hobbs as Larson's attorney in the interference proceeding, but did not withdraw his own appearance in the Patent Office. In this letter he also advised Hobbs that Snap-On would require Larson to furnish tangible security to indemnify it before Snap-On would reassign the Larson application to Larson. On December 19, Hobbs declined to accept the appointment and notified Alberts that his demand for security from Larson was unreasonable.

On that day Automotive's attorney, by letter to Alberts, stated that the latter and his client Johnson, president of Snap-On, should realize that they were holding up the issuance of the Zimmerman patent without the slightest justification. That letter further stated:

"In the second place, we do not believe that you can divest yourself of all responsibility in this matter. You are still the attorney of record. Snap-On still has legal title to the Larson application in interference. As attorney for Snap-On and Larson, you took depositions on behalf of Larson. You instructed witnesses at opportune times—inopportune times for Automotive—not to answer certain pertinent and searching questions asked on cross-examination on behalf of Automotive. You employed the reporter. Part of the transcript is not reported correctly or fully. The reporter delayed in transcribing part of the record. You must recognize that a large part of the testimony taken on behalf of Snap-On and Larson is, to put it mildly, not the whole truth. Mr. Johnson of Snap-On has been fully advised of the situation—so far as it has developed—and I assure you that there are further developments to still be revealed. * * *"

This portion of the letter is relied upon by the defendants as implying a threat to prosecute, in order to gain an unfair advantage. It must be remembered, however, that as early as November 29, 1940, Larson and Carlsen had instructed their attorney to concede priority, and that offer was submitted to plaintiff as early as December 2. The proposal then made by Hobbs for Larson was acceptable to plaintiff, but in as much as the Larson application had been assigned to Snap-On, its consent was necessary. If given it would have settled the interference, but it was not given to plaintiff until December 24, and the delay was caused by Snap-On, and the reason therefor is quite well expressed in a letter from Alberts to his client on December 19, wherein he stated, " * * * My effort all along has been to stiffen Larson's position so that he would not leave Snap-On * * * holding the bag—contract or no contract * * *. I would like for you to submit to your general counsel the entire matter insofar as it relates to a possible suit for conspiracy with Larson to defraud Ammco. (Plaintiff.)"

On that same day Alberts replied to the letter from plaintiff's attorney and characterized it as threatening in its nature, and charged plaintiff's attorney with having used duress in his cross-examination of Larson. (This was three weeks after he had heard Larson's confession.) He further stated:

" * * * The only evidence leading to any wrongdoing thus far was given to Mr. Johnson and myself at your office on November 28, 1940. That evidence was given by an individual who has already admitted that he has committed wrongdoings against your client, himself, and Larson. * * *

" * * * If everything Mr. Thomasma has said could or will be proved, even then Larson is entitled to be defended by an attorney whether such be myself or some other attorney. * * *

" * * * I certainly do not regard Mr. Thomasma as an individual of such repute that his uncorroborated words are deserving of being accepted hook, line and sinker. Present corroboration of the competent type with sufficient competency to outweigh Larson and his corroborators, and then your client is entitled to an award of priority. Beyond that I do not care to discuss any further phase of the case for the present."

The next day, December 20, 1940, Hobbs, Alberts and plaintiff's attorneys conferred and agreed on terms of settlement. At Al-

bert's request, separate agreements were entered into between Snap-On, Precision and Larson; Automotive, Precision and Larson; and Automotive and Snap-On. These were reduced to writing, executed, and exchanged by the attorneys on December 24, 1940. Neither plaintiff nor its attorneys had knowledge of the contents of the Snap-On-Precision-Larson agreement until about April 14, 1943. The substance of these contracts, in so far as they are here material, is as follows:

1. By the Automotive and Precision-Larson contract, Larson conceded priority to Zimmerman as to the common subject matter disclosed in the Larson and Zimmerman applications. The Larson application was to be assigned to Automotive. Precision paid $500 to Automotive. Precision and Larson acknowledged validity of the claims of the patents to issue on the Zimmerman and Larson applications. Automotive gave Precision the right to complete unfilled orders on hand from Snap-On to the extent of approximately 6,000 wrenches with a royalty to be paid on the excess, released Precision and Larson and their customers from liability for infringement by reason of the manufacture and use of previously sold wrenches, and gave Precision and Larson a general release as to all civil damages.

2. By the Automotive and Snap-On contract, Snap-On agreed to reassign the Larson application to Precision, and acknowledged validity of the claims of the patents to issue on the Zimmerman and Larson applications. Automotive gave to Snap-On the right to sell said approximately 6,000 wrenches then on order, released Snap-On and its customers from all liability for infringement by reason of the sale of previously sold wrenches, and gave to Snap-On a general release as to all civil damages.

3. By the agreement between Snap-On on the one hand, and Larson and Precision on the other, Snap-On reassigned to Larson and Precision whatever title Snap-On had to the Larson application, and Precision agreed to manufacture and deliver to Snap-On the approximately 6,000 wrenches then on order. Larson assigned outright to Snap-On a joint application filed by Larson and Walraven and not involved here. Snap-On advanced to Precision the $500, which was paid to Automotive. Snap-On assented to the Automotive and Precision-Larson agreement and agreed to the cancellation of an agreement between it and Precision dated September 28, 1938, by virtue of which Snap-On had obtained title to the Larson application.

The $500 which Snap-On turned over to Precision was paid out of the defense fund which Snap-On was withholding under their agreement of September 28, 1938. It was paid by Precision to Automotive, who in turn paid it to Thomasma for his Precision stock, which stock was then delivered to Precision by Automotive, who retained no part of the $500. This was done pursuant to an understanding of all the parties, and at the request of Hobbs. We gather from the record that this was due to the ill feeling between Thomasma and the defendants and the further fact that the former had tried to sell his stock to plaintiff's president on November 3, 1940. However that may be, plaintiff agreed to use its good offices to that end and was successful.

In conformity with these agreements, the Larson application was duly assigned to Automotive on December 20, 1940. Later the latter added further claims which were allowed, and the Larson patent was issued to Automotive.

Both Snap-On and Precision operated under the interference settlement agreements as to the orders therein referred to. As soon as those orders were filled, Precision began to furnish, and Snap-On began to sell, a modified wrench for which Alberts had prepared a patent application for Larson on December 26, 1940, on which day Larson executed it at Snap-On's place of business. On January 16, 1941, Snap-On entered into a new agreement with Precision under which the latter was to manufacture the new wrench for Snap-On. That is the wrench which is here charged with infringement. Snap-On has continued to deal with Larson and Precision, and Alberts has continued to represent Larson in connection with other patent applications.

On March 10, 1943, all issues had been joined with respect to the complaint, petition for declaratory judgment and the counterclaims thereunder. On March 27, 1943, at a pre-trial examination of Larson in open court, as requested by plaintiff, Larson admitted his perjury and thereupon Automotive's counsel called the court's attention to that fact. That admission, aside from the filing of the joint amended, unverified answer of the defend-

ants on February 8, 1943, and Snap-On's third amended petition for a declaratory judgment on March 1, 1943, verified by Alberts, was the only confirmatory evidence of Thomasma's story of which plaintiff had knowledge. When on February 8, the defendants jointly filed their amended answer, it was notice to the world that Larson had committed perjury. Likewise, three weeks later, Snap-On gave the same notice when Alberts filed its amended verified petition. Prior to those dates, plaintiff and its attorneys, of course, were morally certain that Thomasma's story was true, but they did not think that the uncorroborated evidence of their traitorous former employee would be accepted as against Larson's nine witnesses. This was Albert's opinion, as expressed in his letter to plaintiff's attorneys on December 19, and also the opinion of those disinterested persons whom plaintiff's counsel consulted. Under these circumstances we think it is clear that no duty devolved upon plaintiff to report its information to either the District Attorney or the Patent Office. Certainly there was no active concealment, or misrepresentation, and after the court was informed, no duty rested upon plaintiff or its attorneys except to testify truthfully when called upon by the authorities.

It is elemental that we are bound by the material facts as found by the District Court, if they are supported by substantial evidence, otherwise we are not bound by them. The facts found by the court, with but very few exceptions, are exact copies of those requested by the defendants, and many of them are not findings of facts. The court did not find that, on or before the contracts and assignment were executed, plaintiff or its attorneys knew that Larson's proofs were perjured. The defendants' requested finding No. 11 was to that effect, but the court's finding No. 11 substituted the word "insufficient" for the word "perjured."

Larson testified at his pre-trial examination that Hobbs, his own attorney, told Carlsen and himself that Fidler had told Hobbs before December 20, 1940, that if the contract was not signed Fidler would "turn loose the dogs and I would go to jail." Hobbs emphatically denied this statement and denied that he had made any threat of his own or any one else to Larson, Carlsen, Precision, Alberts or Snap-On. Moreover, Fidler and Lindsey testified that neither of them had ever made any threats to Hobbs or to any one else. Larson said Hobbs was the only one who gave him any information concerning threats and charges of perjury, and Carlsen said that all of his dealings with respect to the settlement were between himself, Larson and Hobbs, and Alberts was not in the picture. There are conflicts in the evidence with respect to this phase of the case, and they cannot be reconciled so as to believe all the testimony of these three witnesses. However, the District Court informs us that Hobbs told the truth, and it is our duty to disregard all other evidence which cannot be reconciled therewith.

Johnson, Snap-On's president, testified as to threats of prosecution made by plaintiff's attorneys. However, such threats were denied by those attorneys, and Johnson testified that neither he nor his company was coerced into signing the agreement either directly or indirectly. Moreover, Larson testified that the agreement contained somewhere near a reasonable settlement, and his attorney Hobbs said that it was a fair one, and so advised him when he signed it.

Alberts, attorney for the defendants, testified at great length with respect to practically all phases of the case. Some of his statements are quite inconsistent with others made by him. Others were categorically denied by those to whom he attributed their authorship, including Hobbs He laid great stress upon what he interpreted as threats to prosecute Larson, which were contained in letters from plaintiff's attorney. Certainly these were not direct threats, and his interpretation of them is based purely upon inferences which we think were not warranted, and were mere products of his imagination.

The District Court did not believe the testimony of Larson, Carlsen or Alberts, or any other witness, where it contradicted Hobbs' testimony, and the latter did not disagree with the testimony of plaintiff's attorneys which related to the same facts. Some, if not all, of these first-named witnesses testified to an agreement among all the attorneys that all the evidence, incriminating or otherwise, would be destroyed. This testimony was denied emphatically by Hobbs and plaintiff's attorneys, and their denial is supported by the fact that no part of the evidence adduced was ever destroyed, and all of it is set forth in the printed record now before us, or is in the

hands of the clerk of this court. Hobbs had notified plaintiff's attorneys that he desired all evidence preserved. A portion of Larson's proofs had not been transcribed and never has been, and some parts had been transcribed incorrectly. When Fidler notified Alberts of his intention to take plaintiff's proofs and of his desire to have full copies of Larson's proofs, Alberts notified his reporter of that fact, and requested him to complete his transcription and notified Fidler of that fact. They were not completed when the settlement was executed, whereupon, in compliance with Hobbs' request to preserve all evidence, Fidler notified the reporter of the settlement and requested him to deliver his transcriptions and his untranscribed notes to Alberts, who had employed him for the defendants. The defendants now stress this circumstance as proof of plaintiff's effort to conceal and suppress testimony. There is no merit in this contention.

In Fidler's letter to Hobbs on December 28, he said, "As to other clean-up matters that we discussed last Tuesday, I will be glad to go into the same with you, whenever you are ready." Defendants urge that the words "clean-up matters" indicate a purpose to destroy the evidence. However, both Hobbs and Fidler testified that the words referred only to three matters which they had previously discussed, which were (1) a new and corrected assignment of the Larson application from Snap-On to Precision and Larson; (2) a correction in the Automotive-Precision agreement, and (3) procuring from Precision a list of the wrench orders then on hand from Snap-On. This testimony is supported not only by Hobbs' letters to Fidler on December 30, and January 4, but by the District Court's memorandum of July 12.

We are convinced that the contradicted testimony of Larson, Carlsen, Alberts and Johnson has no probative value and cannot be considered as substantial evidence in the light of this record.

The defendants further contend that the Larson application should have been a joint application by Larson and Thomasma. This record does not warrant such conclusion, and we think our conclusion in this respect is strongly supported by the facts that the application was filed on October 1, 1938, by Alberts, the attorney for Larson and Snap-On, and it was assigned to Snap-On. The defendants and Alberts were fully informed as to the contents of the Thomasma affidavit on November 28, 1940, which fully stated his connection with the Larson disclosure. The defendants continued to operate under the pending application, and raised no question as to Thomasma's joint authorship of Larson's disclosure until March 1, 1943, when Snap-On, by Alberts, filed its amended petition for a declaratory decree. This was more than three years after they had full knowledge of the contents of the Thomasma affidavit, and more than two years after Larson had secretly confessed his perjury to them.

The defendants further contend that the claims added to the Larson application after its assignment to plaintiff, which claims were subsequently allowed by the examiner, were not within the purview of the parties' contract. The examiner is not bound by contractual limitations of the parties as to the additions or rejections of claims. Here, however, the contract is silent on the subject, and we know of no reason why proper additional claims may not be allowed to the assignee under the name of the inventor as well as to the inventor before assignment. Whether the examiner erred in allowing one or more of the additional claims, or whether any of the claims are valid are questions which are not before us on this appeal. The patent is presumed to be valid, and we hold that additional claims were not precluded by the contract of the parties. Nor did their allowance render the contract between plaintiff and the defendants an unconscionable one.

We are convinced that the findings of fact, with respect to plaintiff, are not supported by substantial evidence, and that the conclusions of law are not supported by the findings. The court's ruling in dismissing plaintiff's complaint and its supplemental complaint in the infringement suit, and its counterclaims in defendants' suit for a declaratory judgment is reversed. As to all other matters the decree is affirmed. The cause is ordered remanded for further proceedings not inconsistent with this opinion.