## PRECISION INSTRUMENT MANUFACTURING CO. ET AL. *v.* AUTOMOTIVE MAINTENANCE MACHINERY CO.

No. 377. Argued January 31, February 1, 1945.—Decided April 23, 1945.

*Mr. Casper W. Ooms,* with whom *Mr. Will Freeman* was on the brief, for petitioners.

*Mr. Frank Parker Davis,* with whom *Mr. Albert J. Smith* was on the brief, for respondent.

MR. JUSTICE MURPHY delivered the opinion of the Court.

The respondent, Automotive Maintenance Machinery Company, charged in two suits that the various petitioners had infringed three patents owned by it relating to torque wrenches.[1] It was further asserted that the allegedly infringing acts also breached several contracts related to the patents. In defense, the petitioners claimed inter alia that Automotive possessed such "unclean hands"

---

[1] The three patents involved are No. 2,279,792, issued on April 14, 1942, to Kenneth R. Larson; No. 2,283,888, issued on May 19, 1942, to H. W. Zimmerman; and reissue No. 22,219, issued on November 3, 1942, to H. W. Zimmerman, based on original No. 2,269,503.

as to foreclose its right to enforce the patents and the contracts.

The District Court, at the close of a consolidated trial on the sole issue of Automotive's alleged inequitable conduct, delivered an oral opinion holding that Automotive's hands were soiled to such an extent that all relief which it requested should be denied. This opinion was subsequently withdrawn at the request of one of the witnesses and is not a part of the record. At the same time, however, the court entered written findings of fact and conclusions of law, forming the basis for a judgment dismissing the various complaints and counterclaims "for want of equity." On appeal, the Circuit Court of Appeals reviewed the facts at length and concluded that the District Court's findings of fact were not supported by substantial evidence and that its conclusions of law were not supported by its findings. The judgment was accordingly reversed. 143 F. 2d 332. We brought the case here because of the public importance of the issues involved.

The basic facts necessary to a determination of the vital issues are clear and without material dispute. In chronological order they may be summarized as follows:

In 1937 and prior thereto Automotive manufactured and sold torque wrenches developed by one of its employees, Herman W. Zimmerman. During this period Snap-On Tools Corporation was one of its customers for these wrenches. Automotive also had in its employ at this time one George B. Thomasma, who worked with Zimmerman and who was well acquainted with his ideas on torque wrenches. In November, 1937, Thomasma secretly gave information to an outsider, Kenneth R. Larson, concerning torque wrenches. Together they worked out plans for a new wrench, although Thomasma claimed that it was entirely his own idea.

After unsuccessfully trying to interest other distributors, Larson made arrangements to supply Snap-On with

the new torque wrench. On October 1, 1938, Larson filed an application for a patent on the newly-developed wrench, which application had been assigned to Snap-On several days prior thereto.[2] Then in December, 1938, Larson, Thomasma and one Walter A. Carlsen organized the Precision Instrument Manufacturing Company to make the wrenches to supply Snap-On's requirements. All three received stock and were elected officers and directors of the new company. Manufacture of the wrenches began in January, 1939, and Precision succeeded in taking away from Automotive all of Snap-On's business. Thomasma continued to work for Automotive until the latter discovered his connection with Precision and discharged him in June, 1939. Thomasma's connection with Precision was also concealed from Snap-On during most of this period.

Subsequently on October 11, 1939, the Patent Office declared an interference between certain claims in Larson's pending patent application and those in one filed by Zimmerman. Automotive was the owner of Zimmerman's application. Shortly after the interference was declared, R. E. Fidler, Automotive's attorney, wrote to the president of the company that the "whole situation confronting your opponents in this interference is quite messy, and I will be somewhat surprised if they fight the matter." He further wrote that if there was a contest "they surely will have a lot of explaining to do."

In August, 1940, Larson filed his preliminary statement in the Patent Office proceedings. In it he gave false dates as to the conception, disclosure, drawing, description and reduction to practice of his claimed invention. These dates were designed to antedate those in Zimmerman's

---

[2] Snap-On agreed to file the patent application for Larson, who was without funds, and took an assignment of the Larson application as security for performance of the agreement to supply wrenches.

application by one to three years. Larson also claimed that he was the sole inventor of his wrench. When Fidler learned of this preliminary statement he immediately suspected that "there must be something wrong with this picture" and suggested to Automotive's president that a "very careful and thorough investigation" be made of the situation. The president agreed. Fidler then employed several investigators who made oral reports to him from time to time. According to Fidler's memoranda of these reports, Fidler learned in great detail in August and September, 1940, the part that Thomasma played in the development of the Larson wrench and in the organization of Precision. He discovered that Thomasma claimed to have invented the wrench and that Larson "was now trying to freeze him out."

From October 24 to November 4, 1940, Larson and eight witnesses testified in the interference proceedings in support of his claims, corroborating his statements as to dates despite cross-examination. The day before this testimony ended Thomasma met with Fidler and Automotive's president and stated that he had developed Larson's wrench and that Larson's patent application was a "frame-up." Fidler then procured from Thomasma an eighty-three page statement concerning these matters, which Thomasma swore to on November 15. As the District Court found, this statement or affidavit "related in extensive detail the statements of Thomasma with respect to Larson's early work and disclosed such intimate knowledge thereof as to leave little doubt of the author's knowledge of the facts."

With these facts before him, Fidler admitted that he "personally was inclined to take the position that I should do something drastic" in the form of taking the matter up with the Patent Office or the District Attorney. He resolved his problem, however, by submitting it to an out-

side attorney. The latter advised him that his evidence was insufficient to establish Larson's perjury, that the Patent Office would not consider the matter until all proofs in the interference proceedings were in and that the District Attorney probably would not touch the situation while the interference proceedings were pending. Fidler followed his advice.

A few days later Fidler informed Larson's patent attorney, Harry C. Alberts, of the information disclosed in the Thomasma affidavit. Alberts admitted that "it looked very much like Larson had given false testimony" and asked that further examination of Thomasma be made in his presence. Accordingly, on November 28, Thomasma was examined orally before Alberts, Fidler and officials of Automotive and Snap-On. Thomasma repeated substantially the same story as in his affidavit. Snap-On's president said that if the story were true "the whole thing smells to the high heavens." And Alberts remarked that under the circumstances he felt he would have to withdraw as Larson's attorney.

On the same day, Alberts and Snap-On's president confronted Larson and Carlsen with the Thomasma story and demanded an explanation. Larson refused to commit himself on the truth of Thomasma's account but finally admitted that "my testimony is false and the whole case is false." Alberts then withdrew as their attorney,[3] giving them the names of three other lawyers, including M. K. Hobbs. The fact that Alberts withdrew was communicated by him to Fidler.

Larson and Carlsen called on Hobbs the next day, November 29. They told him they were willing to concede

---

[3] Alberts apparently never withdrew formally as Larson's attorney in the interference proceedings by filing a document to that effect in the Patent Office.

priority in Zimmerman and wanted Hobbs to settle the interference proceedings.[4] Hobbs took the case on that basis, making no effort to inquire into the reasons for the concession since he considered that matter immaterial. Even when Fidler tried to tell him later about the perjury, Hobbs stopped him for he "didn't want to hear the conflict in testimony."

Hobbs immediately undertook to settle the interference proceedings. On December 2 he proposed a settlement which included a concession of priority by Larson, but this proposal was apparently not satisfactory to all those concerned. Meanwhile Fidler presented the facts to another disinterested lawyer and asked him whether he thought there was enough evidence to bring a conspiracy suit for damages or a criminal action. The lawyer, after admitting that he did not have the slightest doubt but that Thomasma was telling the truth, replied in the negative.

On December 13, Fidler submitted a draft agreement that he had prepared. This draft contained a recital that "it has been determined by the parties hereto and their respective counsel that the party Zimmerman is the prior inventor of the subject matter involved in said Interference No. 77,565, as well as all other subject matter commonly disclosed in said Zimmerman and Larson applications." But this draft was likewise unacceptable.

---

[4] Both Larson and Carlsen testified that they told Hobbs of the perjury and of the predicament they were in, stating to him that they did not want to be turned over to the District Attorney. Hobbs, however, denied that they informed him of these matters. It was at the request of Hobbs that the District Court's oral opinion was withdrawn in order that, in the words of the District Court, it would not be "construed as implying that Mr. Hobbs had willfully given false testimony or had been guilty of professional misconduct." The court further said that the record demonstrated "that the witness Hobbs did not testify falsely." Assuming that Hobbs gave no false testimony, however, we do not consider that fact to be of controlling significance in this case.

For a time, negotiations were broken off and resumption of the interference proceedings seemed imminent. One of the other attorneys for Automotive wrote a letter on December 19 to Alberts, who was still acting as attorney for Snap-On, stating that "you must recognize that a large part of the testimony taken on behalf of Snap-On and Larson is, to put it mildly, not the whole truth" and that "you are holding up the issuance of the Zimmerman patent without the slightest justification." Fidler, who had approved this letter, justified these remarks on the ground that "they had told us Zimmerman was the prior inventor and we hadn't yet received a concession of priority." In reply to this letter, Alberts charged that Automotive's attorneys were using "threatening accusations" and "duress" and that they were threatening to "unloose the dogs" unless they got everything they requested in the settlement.

Suddenly on the next day, December 20, negotiations were resumed and the parties quickly entered into three contracts, the first two of which are involved in this suit. These contracts, in their relevant parts, provided as follows:

(1) Under the Automotive and Precision-Larson agreement, Larson conceded priority in Zimmerman and Larson's application was to be assigned to Automotive. Automotive agreed to license Larson and Precision to complete their unfilled orders from Snap-On to the extent of about 6,000 wrenches, with a royalty to be paid on the excess. Automotive released Precision, Larson and their customers from liability for any past infringement and gave Precision and Larson a general release as to all civil damages. Finally, Precision and Larson acknowledged the validity of the claims of the patents to issue on the Larson and Zimmerman applications.

(2) Under the Automotive and Snap-On agreement, Snap-On agreed to reassign the Larson application to Pre-

cision and acknowledged the validity of the claims of the patents to issue on the Larson and Zimmerman applications. Automotive also gave Snap-On the right to sell the 6,000 wrenches then on order from Precision and released Snap-On from any past liability or damages.

(3) Under the Snap-On and Precision-Larson agreement, Snap-On reassigned to Larson and Precision whatever title Snap-On had to the Larson application. Precision agreed to manufacture and deliver to Snap-On the 6,000 wrenches then on order. Snap-On also assented to the Automotive and Precision-Larson agreement.

The Larson application was accordingly assigned to Automotive on December 20, 1940. Automotive subsequently received patents on both the Larson and Zimmerman applications after making certain changes. Then Precision began to manufacture and Snap-On began to sell a new wrench. Automotive claimed that this was an infringement of its patents and a breach of the contracts of December 20, 1940. Thus the suit arose which is now before us.

The guiding doctrine in this case is the equitable maxim that "he who comes into equity must come with clean hands." This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant. That doctrine is rooted in the historical concept of court of equity as a vehicle for affirmatively enforcing the requirements of conscience and good faith. This presupposes a refusal on its part to be "the abettor of iniquity." *Bein* v. *Heath*, 6 How. 228, 247. Thus while "equity does not demand that its suitors shall have led blameless lives," *Loughran* v. *Loughran*, 292 U. S. 216, 229, as to other matters, it does require that they shall have acted fairly and

without fraud or deceit as to the controversy in issue. *Keystone Driller Co.* v. *General Excavator Co.*, 290 U. S. 240, 245; *Johnson* v. *Yellow Cab Co.*, 321 U. S. 383, 387; 2 Pomeroy, Equity Jurisprudence (5th Ed.) §§ 379–399.

This maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant. It is "not bound by formula or restrained by any limitation that tends to trammel the free and just exercise of discretion." *Keystone Driller Co.* v. *General Excavator Co., supra*, 245, 246. Accordingly one's misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim by the chancellor.

Moreover, where a suit in equity concerns the public interest as well as the private interests of the litigants this doctrine assumes even wider and more significant proportions. For if an equity court properly uses the maxim to withhold its assistance in such a case it not only prevents a wrongdoer from enjoying the fruits of his transgression but averts an injury to the public. The determination of when the maxim should be applied to bar this type of suit thus becomes of vital significance. See *Morton Salt Co.* v. *Suppiger Co.*, 314 U. S. 488, 492–494.

In the instant case Automotive has sought to enforce several patents and related contracts. Clearly these are matters concerning far more than the interests of the adverse parties. The possession and assertion of patent rights are "issues of great moment to the public." *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, 322 U. S. 238, 246. See also *Mercoid Corp.* v. *Mid-Continent Investment Co.*, 320 U. S. 661, 665; *Morton Salt Co.* v. *Suppiger Co., supra; United States* v. *Masonite Corp.*, 316 U. S.

265, 278. A patent by its very nature is affected with a public interest. As recognized by the Constitution, it is a special privilege designed to serve the public purpose of promoting the "Progress of Science and useful Arts." At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. The facts of this case must accordingly be measured by both public and private standards of equity. And when such measurements are made, it becomes clear that the District Court's action in dismissing the complaints and counterclaims "for want of equity" was more than justified.

The history of the patents and contracts in issue is steeped in perjury and undisclosed knowledge of perjury. Larson's application was admittedly based upon false data which destroyed whatever just claim it might otherwise have had to the status of a patent. Yet Automotive, with at least moral and actual certainty if not absolute proof of the facts concerning the perjury, chose to act in disregard of the public interest. Instead of doing all within its power to reveal and expose the fraud, it procured an outside settlement of the interference proceedings, acquired the Larson application itself, turned it into a patent and barred the other parties from ever questioning its validity. Such conduct does not conform to minimum ethical standards and does not justify Automotive's present attempt to assert and enforce these perjury-tainted patents and contracts.

Automotive contends that it did not have positive and conclusive knowledge of the perjury until the pleadings

in the instant proceedings were filed and until Larson admitted his perjury on pre-trial examination. It claims that prior thereto it only had Thomasma's affidavit and statements, which were uncorroborated and likely to carry little weight as against Larson and his eight witnesses. It is further pointed out that Fidler submitted what he knew of the facts to at least two independent attorneys, both of whom advised him that the evidence of perjury that he possessed was insufficient. From this it is argued, as the Circuit Court of Appeals held, that while Automotive was "morally certain that Thomasma's story was true" there was no duty to report this uncorroborated information to either the District Attorney or the Patent Office.

But Automotive's hands are not automatically cleansed by its alleged failure to possess sufficiently trustworthy evidence of perjury to warrant submission of the case to the District Attorney or to the Patent Office during the pendency of the interference proceedings. The important fact is that Automotive had every reason to believe and did believe that Larson's application was fraudulent and his statements perjured. Yet it acted in complete disregard of that belief. Never for a moment did Automotive or its representatives doubt the existence of this fraud. Fidler suspected it soon after he knew of Larson's claims. His suspicions were confirmed by his hired investigators. Then Thomasma revealed such intimate and detailed facts concerning the perjury as to convince all who heard him, despite certain reservations entertained by some persons concerning his trustworthiness. Moreover, Fidler was well aware that Alberts threatened to withdraw as Larson's counsel if he discovered from Larson that Thomasma's story was true and that Alberts in fact did so withdraw. The suspected perjury was further confirmed by Larson's sudden willingness to concede priority after he learned of

Thomasma's story and by the admissions by Alberts and Snap-On that Zimmerman "was the prior inventor." And the very fact that Fidler saw fit to submit his proof to outside attorneys for advice is an indication of the substantiality of his belief as to Larson's perjury. With all this evidence before it, however, Automotive pursued the following course of action:

1. It chose to keep secret its belief and allegedly unsubstantial proof of the facts concerning Larson's perjury. We need not speculate as to whether there was sufficient proof to present the matter to the District Attorney. But it is clear that Automotive knew and suppressed facts that, at the very least, should have been brought in some way to the attention of the Patent Office, especially when it became evident that the interference proceedings would continue no longer. Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. Cf. *Crites, Inc.* v. *Prudential Co.*, 322 U. S. 408, 415. This duty is not excused by reasonable doubts as to the sufficiency of the proof of the inequitable conduct nor by resort to independent legal advice. Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies. Only in that way can the Patent Office and the public escape from being classed among the "mute and helpless victims of deception and fraud." *Hazel-Atlas Glass Co.* v. *Hartford-Empire Co.*, *supra*, 246.

2. Instead of pursuing the interference proceedings and proving the fact that Zimmerman's claims had priority

over those asserted by Larson, Automotive chose to enter into an outside settlement with Larson, Precision and Snap-On, whereby Larson conceded priority. Outside settlements of interference proceedings are not ordinarily illegal. But where, as here, the settlement is grounded upon knowledge or reasonable belief of perjury which is not revealed to the Patent Office or to any other public representative, the settlement lacks that equitable nature which entitles it to be enforced and protected in a court of equity.

3. By the terms of the settlement, Automotive secured the perjured Larson application and exacted promises from the other parties never to question the validity of any patent that might be issued on that application. Automotive then made numerous changes and expansions as to the claims in the application and eventually secured a patent on it without ever attempting to reveal to the Patent Office or to anyone else the facts it possessed concerning the application's fraudulent ancestry. Automotive thus acted to compound and accentuate the effects of Larson's perjury.

These facts all add up to the inescapable conclusion that Automotive has not displayed that standard of conduct requisite to the maintenance of this suit in equity. That the actions of Larson and Precision may have been more reprehensible is immaterial. The public policy against the assertion and enforcement of patent claims infected with fraud and perjury is too great to be overridden by such a consideration. Automotive knew of and suspected the perjury and failed to act so as to uproot it and destroy its effects. Instead, Automotive acted affirmatively to magnify and increase those effects. Such inequitable conduct impregnated Automotive's entire cause of action and justified dismissal by resort to the unclean hands doctrine. *Keystone Driller Co.* v. *General Excavator Co., supra.*

We conclude, therefore, that the evidence clearly supported the District Court's findings of fact and that these findings justified its conclusions of law. The court below erred in reversing its judgment.

*Reversed.*

MR. JUSTICE ROBERTS.

I think the writ should be dismissed or the judgment of the Circuit Court of Appeals affirmed. The case ought not to have been taken by this Court. It involves merely the application of acknowledged principles of law to the facts disclosed by the record. Decision here settles nothing save the merits or demerits of the conduct of the respective parties. In my view it is not the function of this Court to weigh the facts for the third time in order to choose between litigants, where appraisal of the conduct of each must affect the result.

MR. JUSTICE JACKSON is of the opinion that the judgment should be affirmed, as he takes the view of the facts set forth in the opinion of the court below. 143 F. 2d 332.