403 F.2d 65
 EARLE R. HANSON & ASSOCIATES, a partnership consisting of
Harvey Hanson, George V. Hanson, and Mantor J. Hanson; Peter
A. Hanson, Dariy Home, Inc., Dairy Home Company, Minnesota
Milk Company, and Old Home Foods, Inc., Appellants,
v.
FARMERS COOPERATIVE CREAMERY COMPANY OF CLEAR LAKE,
WISCONSIN, Appellee.
 Nos. 18682, 18943.
 United States Court of Appeals Eighth Circuit.
 Nov. 13, 1968, Rehearing Denied Dec. 4, 1968.
 
 Sydney Berde, of Altman, Geraghty, Leonard & Mulally, St. Paul, Minn., for appellants.
 Frank Hammond, of Briggs & Morgan, St. Paul, Minn., for appellee; Terence N. Doyle, of Briggs & Morgan, St. Paul, Minn., and George St. Peter, of St. Peter & Hauer, Fond du Lac, Wis., on brief.
 Before VOGEL, Senior Circuit Judge, LAY, Circuit Judge, and BECKER, Chief District Judge.
 LAY, Circuit Judge.
 
 
 1
 Earle R. Hanson and Associates[1] (hereafter called Hansons) sought specific performance of an option to purchase all of the stock in Minnesota Milk Company at a price equivalent to the 'net book value' of the stock, asserting the 'price' to be a negative amount as of May 20, 1964, the date the option was allegedly exercised. Hansons were at that time the directors and managers of the Minnesota Milk Company under a management contract and voting trust agreement entered into with the defendant Farmer's Cooperative Creamery of Clear Lake, Wisconsin (hereafter called Clear Lake).[2] Clear Lake owned all the outstanding shares of stock in Minnesota Milk Company. Clear Lake refused to honor the option, asserting that plaintiffs had breached the management contract and had failed to tender the proper value for the stock. Defendant alleged in addition that 'net book value' was not a negative figure but in fact approximated $500,000.00.
 
 
 2
 Clear Lake counterclaimed and joined as third party defendants Minnesota Milk Company (also filing cross-claims on its behalf) and several other dairy-related companies[3] which were controlled by the Hansons. Clear Lake alleged these companies had been involved in improper transactions with Minnesota Milk. Defendant sought in its counterclaim to remove the Hansons as voting trustees, directors, officers and managers of Minnesota Milk Company and to recover damages resulting from their alleged mismanagement.
 
 
 3
 The trial court found that plaintiffs had breached their management contract and fiduciary duties. The Hansons were removed as voting trustees, officers and directors, their contract for services and fees was cancelled, and they were denied the right to exercise the option to purchase the stock of Minnesota Milk Company. Alternatively, the court found that plaintiffs for a valuable consideration had orally withdrawn their right to exercise the option, and furthermore found the net book value of the stock involved to be not less than $486,746.84. The trial court otherwise denied the defendant damages. On the basis of proof of substantial breach of contract, we affirm the judgment below.
 
 
 4
 Clear Lake is a milk-producers cooperative which prior to 1956 sold its milk on the Chicago market. It then sought a more favorable market in the Twin Cities area. In 1956 negotiations with the Hansons were begun in order to establish a distributorship for Clear Lake's product. The Hansons acquired an option to purchase an existing milk distributing company and an agreement was reached with Clear Lake to purchase the company. The company was reincorporated in September 1956 under the name Minnesota Milk Company.
 
 
 5
 In connection with the purchase of Minnesota Milk it was initially agreed that Clear Lake would make payment of $430,000.00 in return for 4,300 shares of non-voting Class B stock in the Minnesota Milk Company. A purchase money note and mortgage were given to the former owner by Minnesota Milk to guarantee payment of the unpaid balance. It was also agreed that the Hansons would be issued 7,500 shares of Class A voting stock. These Class A shares were pledged as additional security for the purchase money note and mortgage on Minnesota Milk Company. The Hansons made no initial financial investment in the company; however, for their services they were to receive $50,000.00 annually or fifty per cent of the net profits, whichever was greater. Provisions were made for Minnesota Milk Company to purchase its milk requirements from Clerk Lake, and the other Hanson-controlled companies in turn agreed to purchase their milk requirements from Minnesota Milk.
 
 
 6
 In a subsequent agreement in 1958, the Hansons relinquished all but five shares of their stock in Minnesota Milk Company. These five shares were retained by the Hansons in trust for Clear Lake as 'qualifying shares.' Clear Lake also relinquished its shares of stock in the Minnesota Milk Company and received back 7,495 shares in the company. A portion of these shares were received in consideration of Clear Lake's cancellation of a debt owed it by Minnesota Milk. These shares remained pledged as additional security for the purchase money note and mortgage on Minnesota Milk Company. But in effect, Clear Lake at this time owned all of the stock in Minnesota Milk Company. As a part of this agreement the Hansons agreed to manage the affairs of the company in accordance with the terms of a voting trust agreement and a management agreement. As compensation they were to receive $100,000.00 annually plus a stipulated percentage of the profits. Half of their management fees were to be deferred until the full purchase price of the company was paid. In addition, the Hansons were given an option to purchase Clear Lake's shares of stock in the company at 'net book value' as disclosed upon the books and records of the company.
 
 
 7
 In 1959 Hansons sought to persuade Clear Lake to provide funds to purchase Old Home Creameries, Inc., a cottage cheese manufacturing and distributing company. Upon Clear Lake's refusal to provide the funds, the Hansons themselves borrowed money to make the purchase, and reincorporated the company under the name Old Home Foods, Inc. With Clear Lake's consent, the Hansons in 1961 borrowed additional funds in order to install cottage cheese manufacturing equipment in the Minnesota Milk Company, for which Old Home Foods, Inc. would serve as distributor. Shortly thereafter the Hansons purchased the outstanding purchase money note and mortgage on Minnesota Milk at a discount from the original owner.
 
 
 8
 From the time of purchase in 1956 until 1963, the Minnesota Milk Company suffered extensive losses under the Hanson management. As a result, both the Hansons and Clear Lake were forced to make substantial financial contributions to the company in order to meet its outstanding obligations and to provide working capital to keep it in operation. Each took notes and chattel mortgages on the company in return.
 
 
 9
 In May of 1964 the Hansons notified Clear Lake of their intention to exercise the option to purchase the outstanding shares of Minnesota Milk Company at a negative value and this action ensued.
 
 
 10
 The Hansons individually or through the Hanson-owned companies loaned Minnesota Milk Company $31,607.98 in order to make the 1960 payment on Minnesota Milk's purchase money mortgage and note, the sum of $50,000.00 in 1963 in order to provide Minnesota Milk with working capital and the sum of $225,000.00 borrowed in 1961 from the bank to put Minnesota Milk in the cottage cheese manufacturing business. In addition, Old Home Foods, Inc. advanced Minnesota Milk $75,000.00 as unsecured loan in 1963. In 1961 the Hansons also borrowed $100,000.00 to purchase the outstanding purchase money mortgage and note from the original seller.[4] Finally, in 1964, the Hansons refinanced their entire existing indebtedness with a loan from the American National Bank in the amount of $450,000.00.[5]
 
 
 11
 Clear Lake on the other hand had loaned Minnesota Milk $144,570.00 over a three-year period so that Minnesota Milk could make its payments on the outstanding purchase money note and mortgage. Clear Lake in addition to its original investment of $430,000.00 likewise cancelled $53,000.00 indebtedness of Minnesota Milk in return for 530 shares of its stock.
 
 
 12
 It is not necessary to reach the issues of the alleged oral modification of the option agreement or the disputed 'net book value' of the stock. There exists substantial evidence which, if believed by the trier of fact, supports a finding of breach of the management contract and breach of fiduciary duty by the plaintiffs in the management of Minnesota Milk. The management contract entered into by the parties called for the Hansons to provide five 'wellqualified executives' who were to devote 'all such time as may be necessary, expedient and desirable to the promotion of the affairs of the company.' Implicit within any contract is the concept of 'good faith and fair dealing' between both parties. See Boulevard Plaza Corp. v. Campbell, 254 Minn. 123, 94 N.W.2d 273, 283 (1959). The evidence fairly demonstrates that the Hansons fulfilled neither of these obligations. They each spent a great share of their time in other business concerns. Some of them did not even have an office at the Minnesota Milk Company. For example, George Hanson hired a replacement for himself at a salary of $5,600.00 per year while Minnesota Milk continued to pay the Hansons in excess of $24,000.00 per year for that position.
 
 
 13
 The evidence supports a finding that the Hansons had only the most perfunctory awareness of the affairs of the company. Minnesota Milk, while under Hanson management, sold products to other Hanson-controlled companies under perilous circumstances. In some instances no records were kept as to the actual cost of these products to Minnesota Milk. It is clear the management had no basis for determining the prices which should have been properly charged. Cottage cheese, for example, was sold to the Hanson-owned Old Home Foods, Inc. for a two-year period without reference to any cost studies. When such studies were finally made, it was revealed that these sales had been made at a price below cost and that Minnesota Milk Company had thereby by incurred substantial losses on all such sales.
 
 
 14
 There is credible evidence to support the trial court's finding that two of the Hansons directed their plant manager to dilute milk samples; that Minnesota Milk sold adulterated milk and misbranded products as to weight and butterfat content; that the Hansons filed false reports with the Department of Agriculture which disguised 'bootleg sales' of cream invoiced as 'miscellaneous supplies and equipment';[6] that George Hanson told the plant manager that if he testified he too would be incriminated; that Minnesota Milk sold milk to Dairy Home Inc. (a Hanson-owned company) at a price determined without knowledge of bottling costs or of costs relating to processing and sale of fluid milk; and that inefficiencies in production of cottage cheese resulted in pouring vats of cottage cheese and sour cream down the drain. The trial court's findings also disclose evidence of cost statements of Minnesota Milk, which were represented by the Hansons to Clear Lake to range from 4.37 to 3.18 1/2 per cwt., whereas in reports to the lending bank Hansons represented costs to be only 1.512 to 1.445 per cwt.
 
 
 15
 A management consultant, the company auditors and the company comptroller, John Harris (son-in-law of George Hanson), cited examples of internal mismanagement in their analyses requested by the Hansons as to the operation of Minnesota Milk. John Harris' condemnation, for example, relates their 'good company management may not be reconcilable with Hanson's interest * * *' These reports were never disclosed to Clear Lake. The Hansons admitted the existence of these problems but did nothing to correct them.
 
 
 16
 We hold that the overall evidence supports a finding of gross mismanagement of the affairs of the Minnesota Milk Company by the Hansons thereby justifying the cancellation of that contract and the denial of all fees as yet unpaid thereunder. Cf. Marsh v. Minneapolis Herald, Inc., 270 Minn. 443, 134 N.W.2d 18 (1965); Peterson v. Mayer, 46 Minn. 468, 49 N.W. 245, 246 (1891). The same evidence justifies removal of the Hansons as directors and voting trustees. Minn.Code Ann. 316.03(3), (4) (1947). The evidence likewise supports a denial of specific performance of the option to purchase the stock of the Minnesota Milk Company. One who seeks equitable relief must approach the court with clean hands. He will not be allowed to profit from his own wrongdoing. See Holland v. Duluth Iron Mining & Development Co., 65 Minn. 324, 68 N.W. 50 (1896). To deny relief under this doctrine it is not required that an alleged wrong by the person seeking such relief be actually fraudulent or sufficient to constitute a basis for legal action. As stated by the Minnesota Supreme Court:
 
 
 17
 'The misconduct need not be of such a nature as to be actually fraudulent or constitute a basis for legal action. The plaintiff may be denied relief where his conduct has been unconscionable by reason of a bad motive, or where the result induced by his conduct will be unconscionable either in the benefit to himself or the injury to others.' Johnson v. Freberg, 178 Minn. 594, 228 N.W. 159, 160 (1929).
 
 
 18
 Cf. Precision Inst. Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Pope Mfg. Co. v. Gormully & Jeffrey Mfg. Co., 144 U.S. 224, 236-237, 12 S.Ct. 643, 36 L.Ed. 426 (1892); Kool Vent Metal Awning Corp. of America v. Bottom, 205 F.2d 209 (8 Cir. 1953).
 
 
 19
 Clear Lake alleged and the trial court found that the Hansons received a secret commission of $25,000.00 in arranging for the purchase of Minnesota Milk Company in 1956.[7] The evidence clearly supports the trial court's findings in this regard.
 
 
 20
 When a person engages in a joint venture of promotion or acts individually as a promoter of a corporation, he occupies a fiduciary position with respect to the corporation and its shareholders. He owes them the duty of good faith. While he may rightfully expect compensation for his efforts, he cannot keep for himself secret profits derived from transactions on the corporation's behalf. See De La Motte v. Northwestern Clearance Co.,126 Minn. 197, 148 N.W. 47 (1914); Venie v. Harriet State Bank, 146 Minn. 142, 178 N.W. 170 (1920).[8]
 
 
 21
 Plaintiffs have docketed a separate appeal, No. 18,943, relating to the overruling of plaintiffs' motion to vacate the judgment and grant a new trial under Fed.R.Civ.P. 60(b). The appeal was consolidated with No. 18,682. Plaintiffs' brief does not outline the basis of error nor was a separate record filed as required under the then controlling appellate rule of this circuit. This is in clear violation of Rule 10(d) of our rules and we deem the appeal abandoned.[9]
 
 
 22
 Judgment in No. 18,682 is affirmed; the appeal in No. 18,943 is dismissed.
 
 
 
 [1]
 Earle R. Hanson and Associates is a partnership now consisting of three brothers: Harvey Hanson, George V. Hanson and Mantor J. Hanson. Earle R. Hanson was also a partner until his death on December 21, 1962. Peter A. Hanson, the father of these four brothers, was associated with them in the Minnesota Milk enterprise, but was not a member of the partnership. He is joined individually in defendant's counterclaim
 
 
 [2]
 Although the management contract was entered into only by the Hansons and Minnesota Milk Company, Clear Lake signed a consent to its terms
 
 
 [3]
 These companies included Dairy Home Inc., Dairy Home Company and Old Home Foods, Inc
 
 
 [4]
 The latter purchase is subject to Clear Lake's separate charge of breach of fiduciary duty. There exist several other claims relating to Hansons' conflicting interests as managers, corporate directors and voting trustees of Minnesota Milk vis-a-vis their actions as private investors. We need not pass upon these claims or the defenses raised in answer to them
 
 
 [5]
 This loan was made to Old Home Foods, Inc., Dairy Home Company and Dairy Home Inc., all Hanson-owned companies, and to Minnesota Milk. The Hansons pledged Clear Lake's 7,500 shares of voting stock which the Hansons held as collateral on the original purchase money note and mortgage. The voting stock had originally been assigned to the bank to secure the 1961 loan of $100,000.00
 
 
 [6]
 The Hansons in reply state that these practices, e.g., filing of false market reports and misbranded products, were not detrimental to Clear Lake in that Minnesota Milk did not lose any money as a consequence thereof. This response is astonishing. We are in effect asked to approve stealth from the public if justified by profit to the company. The welfare of the company under such circumstances takes on a strange and disillusioning perspective. A gentle reply may be made by adoption of the Seventh Circuit's answer to a similar argument made in a case involving circumstances less troublesome than those presented here:
 'It is urged that the evidence shows no harm to the business * * * The sentry sleeping at his post is not less derelict in duty if, haply, disaster does not follow; nor is the responsible employe's disloyalty or insubordination measured by the extent of the resultant harm to the employer, nor minimized if none happens to follow.' Farmer v. First Trust Co., 246 F. 671, 673 (7 Cir. 1917).
 
 
 [7]
 Clear Lake also alleged and the trial court likewise found that the Hansons improperly charged to Minnesota Milk Company the cost, amounting to $7,500.00, of an audit of that company in connection with their attempt to exercise the option here in question. The court ordered these sums, to-wit, $25,000.00 and $7,500.00, set off from the recognized existing indebtedness of Minnesota Milk to the Hansons. Restitution of the audit expense is not challenged here
 
 
 [8]
 As the Minnesota Supreme Court in Venie stated at 178 N.W. 171:
 'It is thoroughly settled law in this state and elsewhere that promoters of a corporation stand in a fiduciary relation to the company to be organized, and those who subscribe for its stock, and are bound to act in perfect good faith in all their relations to the enterprise. * * * And where they betray their trust and by fraudulent means divert to their own use funds placed in their hands for the promotion of the company, they are guilty of such fraud as will deprive them of the right to compensation for services rendered in the organization proceedings.'
 See also H. Ballantine, Corporations 827-31 (Rev. ed. 1946); N. Lattin, Corporations 129-31 (1959).
 
 
 [9]
 Rule 10(d) reads:
 'Effect of Insufficient Printed Record; Correction of Omissions and Mistakes. If it shall appear that the record printed by the appellant or petitioner is insufficient to enable the court to decide questions presented or argued, the court may treat as waived any question which cannot properly be determined from the record as printed. * * *'
 These rules were superseded by the F.R.A.P. in July of 1968.