**DEERE & COMPANY, Plaintiff,**

v.

**HESSTON CORPORATION, Defendant.**

No. C 299–73.

United States District Court,
D. Utah, C. D.

May 4, 1977.

---

Dennis McCarthy, Rand L. Cook, Salt Lake City, Utah, Dugald S. McDougall, Theodore R. Scott, Chicago, Ill., for plaintiff.

William T. Thurman, McKay, Burton, McMurray & Thurman, Salt Lake City, Utah, Gordon D. Schmidt, Warren N. Williams, Schmidt, Johnson, Hovey & Williams, Kansas City, Mo., for defendant.

## MEMORANDUM OPINION IN LIEU OF FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER RULE 52

ALDON J. ANDERSON, Chief Judge.

The plaintiff, Deere & Company ("Deere"), filed this action under 28 U.S.C. § 2201 (1970) for a declaratory judgment that the defendant's eight patents in issue[1] were invalid and that the plaintiff was not, therefore, liable for infringing these patents. The defendant, Hesston Corporation ("Hesston"), counterclaimed for damages and alleged that Deere had infringed Hesston's validly issued and enforceable patents. The court held trial beginning May 10, 1976, and the parties finally submitted the matter to the court following a post-trial hearing on January 28, 1977.

### I. Patents in Issue and Background

The eight patents and the relevant claims in issue are as follows:

(1) Garrison Patent No. 3,556,327 (hereinafter referred to as "Garrison I patent") directed to a haystacking *machine*, which is essentially protected in claims 1, 2, 6, and 7 of that patent;

(2) Garrison Patent No. 3,847,072 (hereinafter referred to as "Garrison II patent") directed to a haystacking *method*, which is essentially protected in claims 1, 3, 4, and 7 of that patent;

(3) Lundahl Patent No. 3,728,849 (hereinafter referred to as "Lundahl I patent") directed to a *method* for making haystacks, which is essentially protected in claims 1, 2, 7, and 9 of that patent;

(4) Lundahl Patent No. 3,828,535 (hereinafter referred to as "Lundahl II patent") directed to a haystacking *machine*, which is essentially protected in claims 1, 10, 11, 12, and 13 of that patent;

(5) Adee Patent No. 3,878,670 (hereinafter referred to as "the '670 patent") directed to a press-controlled deflector, which is an improvement on the haystacking machine and is essentially protected in claims 9, 10, 11, and 12 of that patent;

(6) White Patent No. 3,899,966 (hereinafter referred to as "the '966 patent") directed to improving the haystacking machine by using the press-actuating power cylinders to open and close the tailgate, which improvement is essentially protected in claims 5, 6, and 7 of that patent;

(7) Brooks-McDaniel Patent No. 3,757,687 (hereinafter referred to as "the '687 patent") directed to an improvement of the press-actuating mechanism, which is essentially protected in claims 4, 5, 6, 7, 8, and 10 of that patent; and

(8) Anderson Patent No. 3,842,732 (hereinafter referred to as "the '732 patent") directed to a further improvement of the tailgate actuating mechanism, which is essentially protected in claims 1, 2, 5, 7, and 10 of that patent.

The parties' dispute mainly centers on the Lundahl I, II and Garrison I, II patents. For this reason, the court hereafter will frequently refer to these patents collectively as "the four major patents in issue."

---

1. While the original complaint sought a declaratory judgment on only two of the major patents, Hesston counterclaimed on eight additional patents of which two design patents were withdrawn before trial; eight patents presently remain in issue.

The relevant background to these patents reveals that in the early 1960's, Cordell Lundahl (doing business with his father Ezra C. Lundahl as Ezra C. Lundahl, Inc.) began to build and test a machine designed to compress loose hay into a large, dense, weather-resistant haystack. Cordell Lundahl's first stacking wagon had high side walls and a false front which was used to compress the hay at appropriate intervals as the hay collected against the closed rear doors of the wagon. In addition to the horizontal compaction against the rear doors, the hay was compacted vertically by means of two swingable, gate-like presses to form the top of the stack. To enhance the structural integrity of the haystack as it was being formed in the wagon, Cordell Lundahl added supplemental compressors to the underside of the gate-like presses to increase the vertical compression of the hay. This Lundahl haystacking wagon, unlike later prototypes, did not have an integrated means for picking up the hay from the field windrow, elevating the hay, or spreading the hay evenly in the wagon. Rather, the hay was deposited in the wagon by means of a tractor-operated pitchfork called a "Farmhand."

Ezra C. Lundahl, Inc., in the February 3, 1966, issue of the *Montana Farmer-Stockman*, advertised a "one man automatic feeding system for long hay" that would "also stack and compress loose hay from the windrow." As a result of this advertisement, Ezra C. Lundahl, Inc., sold a haystacking wagon to DePuy Enterprises, Inc., on July 1, 1966 (hereinafter referred to as "the DePuy machine"). The DePuy machine was used during the 1966 haying season and for at least part of the 1967 haying season. In 1968, DePuy Enterprises, Inc., filed suit for damages for breach of warranty against Ezra C. Lundahl, Inc., due to certain mechanical failures in the DePuy machine that had developed during use. Ezra C. Lundahl, Inc., settled the lawsuit by paying the plaintiffs $2,999. The DePuy machine was thereafter abandoned for haystacking purposes.

Hesston acquired the assets of Ezra C. Lundahl, Inc., on August 1, 1966, and continued the development of the haystacking machine. Hesston transferred an engineer, Keith Garrison, to Logan, Utah to complete and to reduce to practice a haystacking wagon based on Cordell Lundahl's original concepts. Lundahl and Garrison completed the development of a prototype haystacking machine in December, 1966. The prototype was then field tested in Arizona and Florida during early 1967. This prototype embodied pressing components, a hay pickup device, an elevator, a structure to spread the hay evenly in the wagon, a tailgate that opened to unload the formed stack, and a device to push the formed stack out of the wagon onto the ground.

On June 1, 1967, Garrison returned to Hesston's Kansas headquarters to design a haystacking wagon for commercial manufacture that was to be "functionally equivalent although structurally different" from the Lundahl haystacking wagon. (Hesston's Main Brief at 89). As Hesston admits, "manufacture of the Garrison machine infringes the claims of the Lundahl patents" (Hesston's Main Brief at 89), but Hesston has paid Lundahl for such infringement. Garrison's haystacking machine improved certain features of the earlier Lundahl wagon and was reduced to practice in the fall of 1968.

Hesston authorized its attorney to begin preparing patent applications on both the Lundahl and Garrison machines on September 5, 1968. Hesston filed the initial Garrison patent application with the Patent Office on April 14, 1969. Hesston filed the initial Lundahl patent application with the Patent Office on November 14, 1969, although Lundahl's haystacking wagon concept and development antedated that of Garrison.

In applying for the Garrison I patent, Hesston did not refer to the prototype Lundahl haystacking wagons on which Garrison had worked to improve and to reduce to practice a haystacking machine originally conceived by Lundahl. The Garrison I patent application matured on January 19, 1971, and is now in issue in this lawsuit.

By filing a "divisional application" on October 23, 1970, Hesston sought to secure a patent on method claims for making haystacks. The patent examiner initially rejected all the method claims as unpatentable over prior art. Despite Hesston's rewritten and resubmitted method claims, the patent examiner again rejected the divisional application and cited as grounds for such rejection the Sutherland British patent:

"Sutherland shows a harvester which advances across a field, picks up crop, conveys it to a chamber and lowers a press on the crop. Applicant's recited method differs from Sutherland in the exact type of conveying, i. e., the use of a blower conveyor. This feature is, however, shown to be old by Bayerische Pf. in the same environment and a mere substitution of equivalents exists."

Hesston thereafter abandoned the divisional application.

Hesston filed a continuation application on April 16, 1973. The Patent Office allowed the claims in the continuation application and the Garrison II patent now in issue matured on November 12, 1974.

On March 9, 1972, the patent examiner rejected the Lundahl patent application, filed November 14, 1969, on the ground that the claims therein were "clearly anticipated by Garrison." On October 4, 1972, Ezra C. Lundahl filed an affidavit under Rule 131, 37 C.F.R. § 1.131 (1976), "swearing back" of the Garrison application. This procedure overcame the prior art reference to the Garrison I patent. However, in pursuing the Lundahl I patent application, Hesston did not disclose to the patent examiner the existence or the sale of the DePuy machine. The Lundahl patent application matured into a patent on April 24, 1973.

On February 7, 1973, Hesston filed a "divisional application" to secure the machine claims on the Lundahl haystacking wagon. The patent examiner initially rejected this divisional application in light of the prior Garrison I patent. By reference to the 131 Affidavit of Ezra C. Lundahl, Hesston overcame the Garrison I patent as a prior art reference. On February 19, 1974, the patent examiner allowed some claims, but rejected other claims as unpatentable over the Sutherland British patent in view of the Bayerische reference. Hesston filed an amendment dated April 1, 1974, in which it stated that:

"The Claims in this case were prepared and submitted on the basis of a rather full and comprehensive knowledge of voluminous prior art, including the three (3) references herein referred to by the Examiner. The key to Claims 15–30 lies in Lines 11–13 of Claim 24 and is directed to a concept that is simply not contemplated by any prior disclosure known to applicant.

Never before has any one clearly come up with the idea of using a press other than to carry out its normal function of material compressing. More particularly, it is absolutely new to provide a hay gathering or collection feature in a press as its initial function in cooperation with the main crop receiving body."

The patent examiner subsequently allowed the claims and the Lundahl II patent was issued on August 13, 1974.

The factual summary to this point is relevant to the issue of patent validity and enforceability. The court need not narrate the facts relevant to Hesston's infringement counterclaims at this point. Deere raises two issues, based on these facts, that are relevant to patent validity and enforceability which the court must analyze before proceeding to the infringement issue.

First, Deere contends that the four major patents in issue are unenforceable since they were allegedly obtained through Hesston's fraud on the Patent Office. Secondly, Deere contends that notwithstanding the fraud issue, the patents in issue are invalid because they fail to satisfy the standards of patentability set forth in 35 U.S.C. §§ 102(b), 103 (1970).

## II. Fraud on the Patent Office

■ Deere contends that Hesston perpetrated a fraud on the Patent Office by failing to disclose: (1) during the course of

the applications for the Garrison I and II patents, the prior art taught to Garrison by the earlier Lundahl prototype haystacking wagon tested in Arizona and Florida, on which Garrison merely contributed mechanical improvements to Lundahl's original concept; and (2) during the course of the applications for the Lundahl I and II patents, the development and sale of the De-Puy machine, which Deere contends is prior art on the Lundahl I and II patents.

In *Kingsland v. Dorsey*, 338 U.S. 318, 70 S.Ct. 123, 94 L.Ed. 123 (1949), the United States Supreme Court, adopting the language of the Patent Commissioner, set forth the standard of conduct required of counsel practising before the Patent Office:

" 'By reason of the nature of an application for patent, the relationship of attorneys to the Patent Office *requires the highest degree of candor and good faith.* In its relation to applicants, the Office . . . must rely upon their integrity and deal with them in a spirit of trust and confidence . . . .' "

*Id.* at 319, 70 S.Ct. at 124 (emphasis added). *Accord Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). The policy supporting this standard of conduct is "[t]he far-reaching social and economic consequences of a patent . . . [that] give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope." *Id.* at 816, 65 S.Ct. at 998.

To establish that the patent is invalid or unenforceable Deere must establish by clear and convincing evidence that Hesston procured the four major patents in issue by fraud. *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 394 (10th Cir. 1965). To constitute fraud on the Patent Office, Deere must prove that Hesston's nondisclosure was material, i. e., that the Patent Office would have rejected Hesston's four major patent applications *but for* Hesston's fraudulent conduct in not disclosing the

earlier Lundahl haystacking wagons. *See Norton v. Curtiss*, 433 F.2d 779, 795, 57 Cust. & Pat.App. 1384 (1970). On the present state of the record and based on the court's subsequent analysis herein of the prior art, including the earlier Lundahl haystacking wagons, Deere has not proven by clear and convincing evidence that the Patent Office would have rejected the four major patents in issue but for the allegedly fraudulent nondisclosure.

Deere must also prove by clear and convincing evidence that Hesston's conduct before the Patent Office in not disclosing the prior Lundahl haystacking wagons during the applications for the four major patents in issue constituted willful, intentional, or wrongful conduct, *Tokyo Shibaura Electric Co. v. Zenith Radio Corp.*, 404 F.Supp. 547, 569 (D.Del.1975); *In re Frost Patent*, 398 F.Supp. 1353, 1366 (D.Del.1975), or that Hesston's conduct was "so extreme as to be described as recklessness or gross negligence." *Turzillo v. P&Z Mergentime*, 174 U.S.App.D.C. 318, 325, 532 F.2d 1393, 1400 (1976). In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965), the Court distinguished patents procured by "intentional fraud," which would strip the patentee of its antitrust exemption, from "technical fraud," which would not render the patent invalid so long as the patentee made "an honest mistake as to the effect of prior [art] upon patentability." *Id.* at 177, 86 S.Ct. at 350. *See Xerox Corp. v. Dennison Manufacturing Co.*, 322 F.Supp. 963, 968–69 (S.D.N.Y.1971) (allowed patent applicant "the right to exercise good faith judgment in deciding what matters are and are not of sufficient relevance and materiality to require disclosure.").

Based on the present state of the record, the court concludes that the evidence is insufficient to impute to Hesston and its attorneys a fraudulent intent or gross and reckless conduct that would justify a finding of patent invalidity due to a purported fraud on the Patent Office. Hesston and its attorneys exercised good faith judgment on whether to include the prior Lundahl

wagons as prior art in the Lundahl I, II and Garrison I, II patent applications. That good faith judgment, based on a strict notion of the scope of the intended patent in reference to the prior art, though erroneous, will not render the patent invalid. The court, therefore, denies Deere a declaratory judgment that the four major patents in issue are invalid due to Hesston's alleged fraud on the Patent Office.

### III. Patentability

■ Deere seeks a declaratory judgment that the patents in issue are invalid as being unpatentable over the prior art. The determination of patentability must begin with the source of congressional authority to define and to limit patents. The Constitution grants Congress the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to . . Inventors the exclusive right to . . . their Discoveries." *U.S. Const.* art. I, § 8, cl. 8. The statutory and case precedent have interpreted this constitutional provision to require three elements of patentability; utility, novelty, and nonobviousness.

Prior to the passage of the Patent Act of 1952, the two basic statutory requirements for patentability were that the device must be "new and useful." Act of Feb. 21, 1793, ch. 11, 1 Stat. 318. In *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248 (1851), the Supreme Court defined "new" to include what in effect became a third test of patentability; to be patentable a device must demonstrate "skill and ingenuity" beyond that possessed by "the skillful mechanic." *Id.* at 267. *Hotchkiss*, therefore, required that the device be an "invention" to be patentable.

The courts narrowly interpreted this standard of invention. For example, in *Cuno Engineering Corp. v. Automatic Devices Corp.*, 314 U.S. 84, 91, 62 S.Ct. 37, 41, 86 L.Ed. 58 (1941), the Court required that "the new device, however useful it may be, must reveal the flash of creative genius, not merely the skill of the calling." *See also Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 154–

55, 71 S.Ct. 127, 95 L.Ed. 162 (1950) (device must be a "distinctive contribution to scientific knowledge") (Douglas, J., concurring). This standard of invention prior to the Patent Act of 1952 has been severely criticized for failing to provide an objective, practical standard for determining patentability. *See generally* Rich, *Principles of Patentability*, 28 *Geo.W.L.Rev.* 393 (1960).

The Patent Act of 1952 reenacted the "new and useful" formula of patentability by refining the definitions of novelty and utility. 35 U.S.C. §§ 101, 102 (1970). Congress also sought to remedy the lack of a practical standard embodied in the invention test of *Hotchkiss* by introducing into section 103 the objective standard of nonobviousness. As the Court explained in *Graham v. John Deere Co.*, 383 U.S. 1, 14, 86 S.Ct. 684, 692, 15 L.Ed.2d 545 (1966) (emphasis added):

> "The first sentence of [section 103] is strongly reminiscent of the language in *Hotchkiss*. Both formulations place emphasis on the pertinent art existing at the time the invention was made and both are implicitly tied to advances in that art. The major distinction is that *Congress has emphasized 'nonobviousness' as the operative test of the section, rather than the less definite 'invention' language of Hotchkiss* that Congress thought had led to 'a large variety' of expressions in decisions and writings."

The Court also interpreted § 103 as abolishing the test phrased as "flash of creative genius" used in *Cuno Engineering Corp. v. Automatic Devices Corp., supra.* 383 U.S. at 15 & n.7, 86 S.Ct. 684.

To summarize, the present standards of patentability, which the court implements to determine whether Hesston's eight patents in issue are in fact patentable, are utility under § 101, novelty under § 102, and nonobviousness under § 103. Deere does not challenge the Hesston patents on the ground that they are not useful. The court, therefore, presumes, and the evidence supports the conclusion, that Hesston has satisfied the requirements of patentability under § 101.

*A. Nonobviousness Under Section 103*

The Supreme Court in *Graham v. John Deere Co., supra,* set forth the basic factual inquiries to consider in determining patent validity under § 103:

"Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy."

383 U.S. at 18–19, 86 S.Ct. at 694. The Supreme Court has continued to apply the three-pronged *Graham* test of patentability under § 103. *See Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Dann v. Johnston,* 425 U.S. 219, 230, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976).

*The Prior Art*

To demonstrate that the Hesston patents are obvious and thus unpatentable, Deere cites the following prior art references:

(1) Hale Patent No. 371,314 (Oct. 1887) that describes a hay-cocking machine the main function of which was to gather "scattered hay or other fodder up from a field and [discharge] the fodder to the ground in compact piles or cocks for protection against storms." To summarize claims 1 through 4 of the Hale Patent, the hay-cocking machine gathered the hay from the ground, elevated the hay into an open bin, provided a "flexible distribution reciprocating back and forth over the open top," and a hinged bottom to drop the hay "cock" on the ground.

(2) Isom Patent No. 1,272,666 (July 1918) that describes a mechanical hay shocker. Claim 1 of the Isom patent sufficiently sets forth the mechanics of the hay shocker as they are relevant to the present facts:

"A mechanical hay shocker comprising in combination a hopper, delivering means discharging into the hopper, tamping members within the hopper, a draper forming the bottom of the hopper, and means whereby the delivery means may be stopped, the tamping member operated, the doors opened and the draper started in motion in the order named."

(3) Sutherland British Patent No. 951,698 (1964) describing a harvesting machine with the purpose "to provide an improved construction of hay harvesting machine by which the hay can be compressed to form a stack and then deposited on the ground." The Sutherland British patent was the patent examiner's prior art reference for initially rejecting the Garrision II patent application. The Sutherland British patent clearly teaches vertical compression of the hay to form a stack as set forth in Claim 1 of that patent:

"A machine for harvesting hay comprising a wheeled trailer which can be hitched to a tractor, a compression chamber mounted on the trailer and into which the hay can be charged, said chamber being open at the top and having a rear wall which can be opened, and a hydraulically operated compression member by which the hay introduced into the chamber can be compressed to form a stack which can then be ejected from the chamber when the rear wall is opened."

Of particular significance to the Hesston patents are lines 48–60 on page 1 of the Sutherland British patent which describes the compression member of the patent and its use not only to compress the hay, but to form a "ridged top to the stack."

(4) Murphy Patent No. 517,930 (April 1894) describes an improvement on a baling press to open and close automatically the baling chamber by connecting rods and linkage to the press mechanism. Deere cites Murphy as prior art to the '966 patent in the details of the tailgate latching and unlatching mechanism as it works in cooperation with the press actuating power cylinders.

(5) Hill Patent No. 1,164,519 (Dec. 1915) describes a device to compress further cotton that has already been baled by using steam power and a series of "gear-toothed racks" connected to rocking levers. Deere cites Hill as prior art to the '687 patent insofar as Hill teaches the use of intermeshing gear teeth in combination with links and levers to equalize the forces at each corner of a four-cornered press.

(6) Lohry Patent No. 2,230,756 (Feb. 1941) describes a system to actuate automatically automobile windows through a series of gears. Though factually not analogous, Deere cites Lohry as prior art to the '687 patent as teaching the use of intermeshing gear teeth in a mechanical fashion similar to that contained in the Hill patent as it refers to the '687 patent.

(7) Clark Patent No. 3,186,448 (June 1965) describes a device for compressing tobacco into a hogshead by deflecting the flow of tobacco to an even distribution in the container wherein the tobacco is then compacted. Deere cites Clark as prior art to the '670 patent. Deere contends that the '670 patent uses a linkage connected to a single power cylinder which is similar in function to the Clark patent to adjust the crop deflector while raising and lowering the press.

(8) Lundahl Super-60 Forage Harvester which Deere cites as an example of an equivalent device for elevating hay into the bin through a blower-type loader rather than through an endless belt elevator, which represents the different methods of elevating hay between the Garrison and Lundahl patents. The forage harvester is merely an example of an old machine and method for elevating crops which Garrison incorporated into his broad combination to achieve an allegedly patentable result.

(9) Hesston's South African Patent No. 71/5017 that Deere cites, among other foreign patents, as prior art to the '732 patent. Hesston, at page 67 of its Main Brief, tacitly admits that the South African patent reads on the American '732 patent, but argues that the disclosures in the South African patent were not such prior art as to preclude the issuance of the patent since the patent examiner considering the '732 patent had cited and thus knew of the South African patent when he allowed the '732 patent claims.

Deere cites the DePuy machine as prior art to the Lundahl I and II patents. While the DePuy machine does not contain certain mechanical features that were ultimately incorporated into the Lundahl wagons, such as hay pickup, elevation, and spreading devices, the court concludes that the DePuy machine taught several concepts that were eventually embodied in the Lundahl I and II patents. The DePuy machine utilized not only horizontal compaction, but also compressed the hay vertically, though to a limited extent, through the use of the gate-like presses and supplemental compressors. The DePuy machine also contained a false front used to slide the finished stack onto the ground through a tailgate that would open and tilt to allow the stack to slide out of the wagon.

Hesston contends that the DePuy machine was not prior art because it lacked the other devices that picked up, elevated, and spread the hay. In addition, Hesston contends that the DePuy machine utilized gate-like presses that swung in a curvilinear path rather than applying pressure from a perfectly vertical direction; that is, pressure applied along a line perpendicular to the plane. The DePuy machine, however, taught the concept of using vertical compression, though directed from other than a 90 degree angle, to compact the hay to enhance the structural integrity of the haystack and to form a surface on the top of the stack that would be weather-resistant. When the patent applicant seeks a patent on a combination of old elements, the applicant cannot eliminate any one of the old elements from consideration as prior art merely because any one individual old element does not include certain portions or all of the combination of elements.

Deere also cites the 1966–67 Lundahl prototype haystacking wagon, on which Garrison and Lundahl combined their efforts, as prior art to the Garrison I and II patents.

Deere contends that the prototype taught the basic mechanical concepts embodied in the DePuy machine and attempted to add a mechanism to allow "on-the-go" haystacking. Hesston contends that the prototype wagon with its "pelican beaks" constituted merely an abandoned, unsuccessful experiment. Based upon the court's determination that the DePuy machine was prior art, the 1966–67 Lundahl prototype, as an attempted improvement on the DePuy machine, is a *fortiori* prior art to the Garrison patents. The 1966–67 prototype haystacking wagon taught the essential concepts of vertical compression which had been embodied in the earlier DePuy machine as well as the prior art bearing upon pick up, elevation, even distribution, compaction, and discharge as more particularly described in the Hale, Isom, and Sutherland patents. As such, the 1966–67 prototype was prior art to the Garrison patents and Garrison should have disclosed that prior art in the processing of his patent application.

To determine the differences existing between the prior art and the Lundahl I, II and Garrison I, II patents, the court here sets forth what those patents claim. The essential claims at issue in the Lundahl I and II patents, which claim machine and method, disclose that the "hay loader" described therein had the following functions: (1) to pick up the hay crop from the field, (2) to elevate the crop to a position where it could be deposited in the bed of the wagon, (3) to spread the crop evenly in the wagon bed, (4) to use a press structure to confine the hay in the wagon, (5) to use a power press to compact the hay crop vertically at intervals as it accumulated in the wagon bed, and (6) to discharge the finished stack on the ground.

The essential claims at issue in the Garrison I and II patents, which claim machine and method, disclose that the "loose hay wagon" described therein had the following functions: (1) to pick up the hay crop from the field, (2) to elevate the crop to a position over the wagon bed by means of a blower-type loader, (3) to blow the hay into the wagon bed and spread the hay evenly in the bed as it is blown, and (4) to compress vertically the hay at intervals as it is deposited in the wagon bed.

The functions of the four minor patents in issue have already been described hereinabove in relation to Deere's prior art references. The basic function of these four minor patents has also been described in the introductory material to this decision and will not be repeated at this point.

### Obviousness of the Differences

Hesston argues that its patents combine old elements into a device that produces a new and advantageous result. The prior art cited by Deere and by the patent examiners clearly reveals that each element of the Hesston combination patents and the four minor patents was disclosed in earlier patents. The Hale and Isom patents, for example, taught picking up hay from the field and elevating it into a confining chamber. Hale also taught even distribution through a device over the open bin that reciprocated back and forth. The Isom and Sutherland British patents respectively taught the use of a "tamping member" and a vertical compression chamber.

The Tenth Circuit, in *McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381, 393 (10th Cir. 1965), set forth the test for determining when a combination of old elements would constitute a patentable device:

> "It is universally held that a mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than previously performed or produced by them, is not a patentable invention. . . . The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable combination."

The Tenth Circuit recently reaffirmed this test of patentability for combination pat-

ents in *Moore v. Schultz*, 491 F.2d 294, 299 (10th Cir.), *cert. denied*, 419 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161 (1974).

In *Rutter v. Williams*, 541 F.2d 878 (10th Cir. 1976), the court denied patent validity to a patent combining old elements on the basis of two recent Supreme Court decisions in *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976), and *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976). The court in *Rutter* followed the test whether the combination produced a "new and different function." 541 F.2d at 881. Based upon *Rutter*, a combination patent must produce a synergistic result to be patentable and valid; that is, the result achieved by the patent is unexpected when the individual old elements are considered individually by one skilled in the art.

In *Dann v. Johnston, supra*, the Court reversed the Court of Customs and Patent Appeals because the differences between the prior art and the purported inventions were obvious to one reasonably skilled in the art. As the Court explained:

"[T]he mere existence of differences between the prior art and invention does not establish the invention's nonobviousness. The gap between the prior art and the respondent's system is simply not so great as to render the system nonobvious to one reasonably skilled in the art." 425 U.S. at 230, 96 S.Ct. at 1399. Similarly in *Sakraida v. Ag Pro, Inc., supra*, the water flush system to remove cow manure from barns "simply arranges old elements with each performing the same function it had been known to perform, although perhaps producing a more striking result than in previous combinations." *Id.* 425 U.S. at 282, 96 S.Ct. at 1537.

While conceding that the patents in issue represent combinations of old elements, Hesston argues that the patentable, nonobvious difference between the prior art and Hesston's claimed patents is in the use of vertical compression to form a weather-resistant stack that is structurally durable while preserving hay quality. Hesston relies heavily upon "secondary considerations"

under the *Graham* test to demonstrate nonobviousness and patentability such as economic success, widespread acceptance of the device by farmers, and reduction to practice of a workable machine after several frustrating failures. These "secondary considerations" alone, however, are insufficient to overcome the necessary conclusion of obviousness or nonobviousness based on the three-pronged *Graham* analysis. *See Timely Products Corp. v. Arron*, 523 F.2d 288, 294 (2d Cir. 1975).

Having determined the scope and content of the prior art and the differences between the prior art and the purported patentable devices, the court now proceeds to consider whether such differences are obvious to one reasonably skilled in the art. The court approaches this question mindful of the need to avoid using hindsight to determine obviousness, but considers the issue in light of the knowledge available to one reasonably skilled in the art at the time the patents in issue were sought. *See Graham v. John Deere Co., supra* 383 U.S. at 36, 86 S.Ct. 684.

To apply the third prong of the *Graham* test and determine what would be obvious to a person reasonably skilled in the art, the Court in *Dann v. Johnston, supra*, explained this prong of the *Graham* test as follows:

"In the context of the subject matter of the instant case, it can be assumed that such a hypothetical person would have been aware both of the nature of the extensive use of data processing systems in the banking industry and of the system encompassed in the Dirks patent. While computer technology is an exploding one, '[i]t is but an even handed application to require that those persons granted the benefit of a patent monopoly be charged with an awareness' of that technology." 425 U.S. at 230, 96 S.Ct. at 1398 (citing *Graham v. John Deere Co., supra* 383 U.S. at 19, 86 S.Ct. 684). *Accord Rutter v. Williams, supra* at 881 (applied *Dann* requirement that "one granted the benefit of a patent monopoly is charged with an awareness of the existing technology"). As stated in *Application of Winslow*, 365 F.2d 1017, 1020, 53 Cust. & Pat.App. 1574 (1966):

"We think the proper way to apply the 103 obviousness test to a case like this is to first picture the inventor as working in his shop with the prior art references—which he is presumed to know—hanging on the walls around him."

In determining patentability of Hesston's combination patents, the court has duly weighed the admonition of the Supreme Court in *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Co.*, 340 U.S. 147, 152–53, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950) that:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. . . . A patent for a combination which only unites old elements with no change in their respective functions . . . obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

The Court recently reaffirmed this admonition on combination patents in *Sakraida v. Ag Pro, Inc., supra*, 425 U.S. at 281, 96 S.Ct. 1532.

In light of the scope and content of the prior art of which one reasonably skilled in the art is presumably aware, the difference claimed in the Hesston patents in issue would be obvious to one reasonably skilled in the art. Hesston's patents do not achieve a synergistic result (*see, e. g., United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966)), that would be nonobvious to one reasonably skilled in the art. While Hesston's patents certainly demonstrate the work of a skilled mechanic, the differences between these patents and the prior art do not achieve a nonobvious, patentable difference. The Hesston patents have combined old elements that continue to function in the same capacity as they did outside Hesston's combinations, and they do not perform a new and different function even though Hesston wagons succeeded in producing a striking result by combining the old elements.

*B. Novelty Under Section 102(b)*

The Lundahl and Garrison patents are also unpatentable for failure to meet the requirements of § 102(b) in light of the sale of the DePuy machine. While the court has decided that the elements of fraud on the Patent Office are not present in this action, particularly the intentional failure to disclose prior art, the court nevertheless has concluded that the DePuy machine constituted prior art that had been sold more than one year prior to the Lundahl and Garrison patent applications. Section 102(b) states:

"A person shall be entitled to a patent unless—

. . . . .

(b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . ."

The court has carefully and thoroughly examined the exhibits bearing upon this issue and has weighed the facts in light of the legal principles presented by counsel. The court has determined that the DePuy machine was prior art in teaching haystacking concepts and techniques that were eventually improved and refined in the Lundahl and Garrison patents. Hesston, Lundahl, and Garrison were fully familiar with the DePuy machine and with its possible implications for subsequent patent applications. Nevertheless, the Lundahl and Garrison patent applications were filed more than one year after the sale of the DePuy machine.

The record does not support Hesston's contention that the DePuy machine fell within the experimental use exception initially formulated in *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 134, 24 L.Ed. 1000 (1877), that "public use" in the patent statutes does not include "use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection . . .." The advertisement and sale of the DePuy

machine did not contain "an express or clearly implied condition that the sale or offering is made primarily for experimental use." *Robbins Co. v. Lawrence Manufacturing Co.*, 482 F.2d 426, 433 (9th Cir. 1973). *Accord Dart Industries, Inc. v. E. I. DuPont de Nemours & Co.*, 489 F.2d 1359, 1366 & n.13 (7th Cir. 1973), *cert. denied*, 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974). The court, therefore, holds that § 102(b) renders the Garrison and Lundahl patents unpatentable in light of the sale of the DePuy machine more than one year prior to the filing of the patent applications, which placed the concepts embodied therein into the public domain.

The court does not reach the issue of patent infringement since that issue is moot in light of the court's determination that the Hesston patents are invalid under § 103 and § 102(b).

Wherefore, the court enters judgment declaring that the Hesston patents in issue are unpatentable over prior art since they are obvious under § 103 and the DePuy machine was prior art in the public domain more than one year prior to the patent applications for the Garrison and Lundahl patents.